UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case No.:  3:18-cv-00532-TJC-PDB

STATE CASE NO.:  2016-CA-000894
DIVISION: CV-E

**ELYSSEE N. FAULK**,

      Plaintiff,

v.

**ALLERGAN SALES, LLC,
a foreign limited liability company,** and
**RICARDO E. MOJICA**,

      Defendants.

_____/

### AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

The Plaintiff, **ELYSSEE N. FAULK**, sues the Defendants, **ALLERGAN SALES, LLC,**

**a foreign limited liability company**, and **RICARDO E. MOJICA**, and allege the following:

### GENERAL ALLEGATIONS

1.      This is an action for damages in excess of $30,000, exclusive of attorney's fees,

costs, and interest.

2.      All conditions precedent to the filing of this action have been performed or have

occurred.

3.      The Plaintiffs, **ELYSSEE N. FAULK** (hereinafter "Ms. Faulk"), is and was a

resident of, and permanently domiciled in, Jacksonville, Duval County, Florida.

4.      All medical care and treatment rendered to Ms. Faulk upon which the claims set

forth herein are based took place in Jacksonville, Duval County, Florida.

5.      The Defendant, **ALLERGAN SALES, LLC** (hereinafter "Allergan"), is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.  Ms. Faulk is without adequate knowledge or information to allege the citizenship of Allergan.

6.      Allergan is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for the same, in Jacksonville, Duval County, Florida.

7.      Allergan may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

8.      At all times material hereto, the Defendant, **RICARDO E. MOJICA** (hereinafter "Mojica") was and is a resident and citizen of, and permanently domiciled in, the State of Florida.

9.      Allergan's and Mojica's co-conspirators, whom Allergan and Mojica aided and abetted, were:  (i).  Loren Z. Clayman, M.D. (hereinafter "Clayman Senior"); (ii).  his son, Mark A. Clayman, M.D. (hereinafter "Clayman Senior"); and (iii). their medical professional association, Loren Z. Clayman, M.D., P.A. (hereinafter the "Clayman Practice").  Hereinafter, Allergan's and Mojica's co-conspirators will be collectively referred to as the "Claymans."

**FACTUAL ALLEGATIONS**

10.     For at least 15 years, Allergan has known that Clayman Senior, Clayman Junior, and the Clayman Practice were lying to hundreds of female patients by telling them they had ruptured, deflated, or leaking saline breast implants so the Clayman Practice could collect free implants and surgical fees for replacement surgeries.  Allergan knew the Claymans were lying because:  (1). Allergan's own Southeast Regional Sales Director, Mojica, individually and through

the sales representatives working under him, repeatedly encouraged Allergan's Florida plastic and aesthetic plastic surgery customers (including the Claymans) to lie to their patients and on breast implant warranty claim forms about the condition of saline implants in order to obtain free breast implants and surgical fees; (2) as Allergan received a breast implant warranty claim form signed by the patient and Clayman Senior or Junior for each warranty claim made by the Clayman Practice, Allergan was aware that the Clayman Practice was lying to its patients about the condition of their breast implants; (3). for each warranty claim made by the Clayman Practice, Allergan examined the implants at issue and found that they were not defective; and (4). the Clayman Practice's saline breast implant failure rate was significantly higher than the failure rate of 1.5% for each year after surgery that Allergan's own studies of its saline breast implants showed.

With this knowledge, Allergan paid every saline breast implant warranty claim made by the Clayman Practice—5,278 claims—between January 1, 2006 and December 31, 2015. Allergan paid these claims because the Clayman Practice purchased large quantities of breast implants, other medical devices, and pharmaceuticals from Allergan, and Allergan wanted to encourage and promote the Clayman Practice's continued purchase of their products. As demonstrated by the multiple criminal and civil proceedings against Allergan within the past 10 years, it is apparently an integral part of Allergan's marketing plan to bribe physicians to use its products. For these reasons, Allergan and Mojica are liable to Ms. Faulk for aiding and abetting and conspiring with Clayman Senior, Clayman Junior, and/or the Clayman Practice.

### Allergan and McGhan/Inamed

11.    Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants. In 1974, he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

12.    In 1986, McGhan Medical Corp. merged with First America Corporation, changing

its name to Inamed.  The new company's breast implants were still labeled McGhan breast implants.  By this time, the company was one of the largest breast implant manufacturers in the world.

13.    In March 2006, Inamed merged with Allergan, a multinational manufacturer of healthcare products in many different categories, including the following:  dermatology, central nervous system, eye care, women's health and urology, gastroenterology, cardiovascular diseases, infectious diseases, and aesthetics.  Among Allergan's products are Botox (therapeutic and aesthetic), Namenda, Restasis, Linzess, Bystolic, Juvederm, Latisse, Loestrin, Estrace Cream, Teflaro, Dalvance, Ozurdex, Optive, Viibryd, Liletta, and Saphris.  After the merger with Inamed, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

### Allergan's Breast Implant Warranty Program

14.    With all Natrelle breast implants, Allergan includes its "ConfidencePlus Warranty."  With respect to Allergan's Natrelle Saline Filled Breast Implants, the Warranty only applies if there is a loss of shell integrity, resulting in implant rupture or deflation, that requires surgical intervention.

15.    There are two versions of the Warranty:  Standard and Premier.  The Premier Warranty costs an additional $100 with each newly purchased pair of implants, and $200 after a replacement under the Warranty; the Standard Warranty comes at no additional cost with each newly purchased pair of implants, but costs an additional $100 after a replacement under the Warranty.

16.    For purposes of this case, the critical coverage under both Warranties was the amount reimbursed for the cost of replacement/revision surgery (the "Surgery Money"). Under the Standard Warranty, if the originally provided implants were ruptured or otherwise deemed

defective under the Warranty, then Allergan would not only provide replacement implants, but it would also provide $1,200 of Surgery Money for the cost of removing and replacing the patient's implants.  Under the Premier Warranty, Allergan provided $2,400 of Surgery Money for the cost of replacement/revision surgery.

17.     In relation to patients of the Clayman Practice, the Surgery Money provided by Allergan went not to the patient who purchased the Warranty, but to the surgeon performing the removal and replacement surgery, i.e. the Clayman Practice.  In Ms. Faulk's case and the cases of the Clayman Practice's other breast augmentation patients, the surgeons at the Clayman Practice pocketed the Surgery Money, and used the Surgery Money to perform thousands of surgeries that harmed their patients.  The surgeons at the Clayman Practice repeatedly lied to their patients, including Ms. Faulk, telling them that their implants were ruptured, deflated, or leaking and that, as a result, they needed surgery to remove and replace their purportedly defective saline breast implants.  Allergan and Mr. Mojica knew about these lies, and the company substantially assisted and conspired with the surgeons' fraudulent scheme by directly paying the Surgery Money to the Clayman Practice.

**Allergan's Breast Implant Warranty Scheme**

18.     After the merger, Allergan created Allergan Partner Privileges (hereinafter "APP").[1]  APP provided members with rebates, sales growth rewards, a special online physician locator listing, priority customer service line access, preferred shipment status, and certificates and status displays. The purpose of APP was to leverage sales across its entire line of aesthetic products.  To become an APP Partner, a medical practice had to purchase at least three types of aesthetic products:  Botox (one of the company's most profitable products), a dermal filler (i.e.,

---

[1]     As of January 31, 2020, Allergan discontinued the APP.

Juvederm), and breast implants. APP had several tiers based upon the volume of Allergan aesthetic product purchases: Bronze, Silver, Gold, Platinum, and Diamond; Diamond tier partners received the highest level of perks from Allergan.[2]

19.    Despite implementing the APP, in most regions Allergan's breast implants sales lagged behind those of its chief competitor, Mentor, which offered breast implants at lower prices.

20.    To increase the volume of breast implants sales, Allergan encouraged and approved regional sales directors in certain regions[3] to direct their sales representatives to expressly offer Diamond tier APP partners incentives that, crossing legal and ethical boundaries, *amounted to kickbacks and bribes*. In some instances, they offered Diamond APP partners free travel and lavish non-educational parties in exchange for greater breast implant purchases. In other instances, in exchange for increased breast implant purchases, representatives provided Diamond tier surgeons free implants and surgical fees by allowing them to make false breast implant warranty claims.

21.    In the false warranty scheme, in exchange for higher breast implant purchases, Allergan's sales and marketing representatives (including Mojica and those working for him) expressly directed Diamond tier surgery practices (including the Claymans) to falsely claim implants had spontaneously ruptured, deflated, or leaked so they could receive free breast implants and surgical fees under the warranty. One effect of this scheme was that it facilitated "cover ups" by certain surgeons who falsely attributed poor breast surgery outcomes to ruptured, deflated, or leaking implants rather than careless surgical practices. As such, these surgeons were able to make more money from poor surgical practices, as Allergan increased its percentage of the breast implant market despite Mentor's lower prices.

---

[2]    Allergan later added another tier to the top level, Double Diamond.
[3]    Among the known regions where the warranty scheme was encouraged were Southern California, Colorado, and Florida.

**The Clayman Practice**

22.     Clayman Senior was first licensed as a medical doctor in Florida on January 10, 1975.  On December 31, 1976, he completed a residency in plastic surgery, and he began practicing in Jacksonville, Florida.  Soon after establishing the Clayman Practice, he began performing breast augmentation surgeries.  During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

23.     After the FDA prohibited the widespread use of silicone breast implants in 1992, Clayman Senior began using saline filled implants exclusively.

24.     As of the early 2000s, the Clayman Practice began marketing its breast augmentation practice to patients of modest means.  To reach this population, the Clayman Practice advertised extensively in free local discount publications.  Furthermore, the Clayman Practice began charging less for breast augmentations than other local plastic surgeons; while most plastic surgeons charged between $5,000 and $10,000, the Clayman Practice charged only $3,750.  As a result, the Clayman Practice became a high-volume breast augmentation plastic surgery practice.

**Ricardo E. Mojica**

25.     Between 2000 and 2006, Mojica worked as a surgical sales representative for Inamed/McGhan.  The products he sold were breast implants, facial implants, and injectable "fillers."

26.     After the merger with Allergan, Mojica was promoted to Southeast Regional Sales Director, for which his territories included Florida, Georgia, and South Carolina.  Mojica held this position between 2006 and 2013.  According to his personal LinkedIn profile, he was "responsible for leading and developing an elite 10-member sales team," of which he claimed the "foundation of our success was achieved through a collaborative and synergistic team culture."  He also

attributes his success as the Southeast Regional Sales Director to "helping team members achieve their individual goals and open collaboration channels to share effective practices."

27.     In reality, Mojica trained and directed his sales representatives to act in ways that previous managers had prohibited.  Specifically, he trained and directed them to expressly offer Diamond tier APP partners non-educational parties and travel in exchange for increased implant purchases.  He also trained and directed them to employ the breast implant warranty scheme (see paragraphs 14-17).  Specifically, sales representatives were trained and directed to expressly offer Diamond tier partners free breast implants and surgical fees for false warranty claims in exchange for higher breast implant and other aesthetic product purchases.

28.     Soon after adopting these unethical and illegal sales practices, Allergan's breast implant sales volumes increased rapidly in Florida, even though Mentor continued to offer lower prices on implants.  As the volume of breast implant sales rose, the average selling price per implant dropped significantly due to the high number of returned implants.  However, at the same time, the volume of non-breast implant aesthetic product sales increased significantly as well through the APP.

29.     The "average selling price per implant" was an important number used by the sales and upper management. The prices and quantities of implants sold, as well as the number and cost of warranty payments, were used to determine the average selling price per implant. Documentation of the average selling price per implant was provided on monthly and quarterly bases to breast implant representatives, regional sales directors, and upper management. In other words, the high number of warranty claims was apparent to Allergan, "from top to bottom" (from the sales representatives to upper management) after Mojica became responsible for breast implant sales in Florida..

30.     In 2013, Mojica was promoted to Junior Director, Medical Education.  In his new position with Allergan, Mojica was responsible for "building and leading a high-performing team responsible for development of the plastic surgery sales force and plastic surgeons."  In this capacity, Mojica began training and directing sales representatives across the country to, among other things, employ the breast implant warranty scheme with Diamond tier partners.

### The Allergan/Mojica-Clayman Conspiracy

31.     Until the mid-2000s, the Clayman Practice purchased saline breast implants from Allergan's predecessor (Inamed/McGhan) *and Mentor*.  During this time, Clayman Senior began "covering up" his poor surgical practices by blaming post-augmentation complications on leaking, ruptured, or deflated implants.  Clayman Senior lied to his patients because he knew that by claiming that the implants were defective, he could divert blame for the complications away from himself.

32.     During a single year in the mid-2000s, the Clayman Practice made more than 40 warranty claims to Mentor, which amounted to 30 percent of all saline breast implants the Clayman Practice purchased from Mentor.  In response, Mentor's quality assurance department contacted the regional sales manager and advised him that the high number of claims was indicative of fraud. Mentor asked the regional sales manager to meet with Clayman Senior and demand an explanation for the unusually high number of warranty claims.  Clayman Senior refused to meet with the sales manager.  As a result, Mentor permanently ended its relationship with the Clayman Practice, and Inamed/McGhan became the Clayman Practice's sole breast implant supplier.

33.     Following the merger in 2006, the company adopted the APP and installed Mojica as the Sales Director for the Southeast Region, which included Jacksonville, Florida.  Soon afterward, the Clayman Practice became a Diamond tier partner in the APP as a result of its high-

volume purchases of Allergan aesthetic products such as Botox, Juvaderm, and Natrelle saline breast implants.

34.     After Mojica was promoted to Southeast Regional Sales Director, he became personally acquainted with Clayman Senior, his wife Elana Clayman, and Clayman Junior (who was still in his post-medical school training at the time).  Mojica and the Claymans socialized together at national plastic surgery conferences.  Mojica expressly offered the Claymans the opportunity to participate in the Allergan breast implant warranty scheme.

35.     Prior to Mojica being promoted to Southeast Regional Sales Director in 2006, Florida was included in a sales region under the supervision of Regional Sales Director Chuck Farha.  In late 2007 or early 2008, Mr. Farha, while employed by Allergan in another role, noticed an unusually large increase in the sales of Allergan breast implants in Florida, which was surprising to him given that Allergan's implants cost more than its rival, Mentor's, implants.  Mr. Farha investigated the increase by talking to veteran sales representatives working in Florida, who reported that the rapid increase in sales was caused by Mojica.  Mojica told the representatives to ensure APP physicians "were taken care of[,]" which involved Mojica directing the representatives to encourage "high tier APP physicians to make implant warranty claims that were not actual ruptures, deflations, or leaks."  The physicians could in turn offer patients with negative surgical outcomes free implants along with Allergan-paid revision surgeries.  The physicians also received other perks and kickbacks for their purchases.

36.     In Allergan, Mojica, and Mojica's sales representatives, the Claymans found partners willing to assist them in defrauding their patients.  Thereafter, Allergan, Mojica, and the Claymans developed a symbiotic relationship built upon the mutual knowledge and understanding that the Claymans were lying to patients about the condition of their breast implants to receive free

breast implants and surgical fees, in exchange for the Claymans' continued purchases of high volumes of Allergan's aesthetic products, including breast implants.

37.    Between 2006 and 2015, the Clayman Practice drastically increased the number of warranty claims made to Allergan.  The following chart, which is based upon Allergan's warranty claims records for the Claymans, demonstrates the drastic increase:



38.    For a plastic surgery practice to make a breast implant warranty claim to Allergan, the practice is required to return the implants with a claim form signed by the patient.  Upon Allergan's receipt of the claim form and implants, members of the product surveillance department perform what it calls *Laboratory Analyses*, a series of tests designed to identify root causes of

ruptures, deflations and leaks.  The product surveillance department would then generate *Laboratory Analysis* reports detailing its findings. [4]  Nearly every *Laboratory Analysis* report for saline breast implants returned by the Clayman Practice found no evidence of a "loss of shell integrity, resulting in implant rupture or deflation," which was a requirement for payment under Allergan's warranty.

39.    Allergan's studies of its saline breast implants showed a failure rate of 1.5% for each year after surgery.  The Clayman Practice's saline breast implant failure rate was significantly higher than what it should have been according to Allergan's studies.

40.    Nevertheless, Allergan paid every warranty claim from the Clayman Practice between 2006 and 2015; this amounted to **5,278 warranty claims for a total of $8,537,400 in payments**.

41.    The drastic increase in breast implant warranty payments to the Clayman Practice coincided with substantial increases in the Claymans' purchases of Allergan breast implants and non-breast implant aesthetic products.  By 2010, the Clayman Practice more than doubled the number of aesthetic products it purchased from Allergan compared to 2008.  After Mojica became responsible for Florida breast implant sales, the Clayman Practice became a "one supplier shop," with the practice purchasing increased quantities of Botox, Latisse, Juvederm, Kybella, SkinMedica, Vivate, and CoolSculpting.  When a nurse employed by the Clayman Practice asked Clayman Senior why he believed Allergan would keep paying his breast implant warranty claims, he told her, "I know they're going to pay them all because I'm a Diamond level [APP] partner."

---

[4]    One important reason the Allergan-Clayman conspiracy went undiscovered for so many years was that Allergan did not as a matter of course provide patients with copies of their *Laboratory Analysis* reports.

The following chart, which is based upon Allergan's records for breast implant and non-breast implant aesthetic sales to the Clayman Practice, demonstrates the Claymans' substantial increase in Allergan purchases:



42.     During this same time period, other plastic surgery practices that were not APP Diamond tier partners in Mojica's region had their saline breast implant warranty claims denied by Allergan, even though they made fewer than 5 warranty claims per year. And in other instances, Allergan demanded further proof from plastic surgery practices that the claimed ruptures, deflations, or leaks were not the result of actions by patients or surgeons

43.     Furthermore, to the best of the undersigned's information and belief, Allergan has devised an "off-balance-sheet" method of paying breast implant warranty claims.  Specifically, Allergan pays breast implant warranty claims through a captive insurance company created and owned by Allergan.[5]  When a manufacturer such as Allergan creates a captive insurance company, the manufacturer is provided a means of reclassifying otherwise taxable income from across its various divisions and subsidiaries as "premium payments" that go to the captive insurance company.  The formerly taxable income that is reclassified as "premiums" then accumulates within the captive, making it, essentially, a large "slush fund."  In the event the manufacturer uses the captive insurance company to pay a "loss," such as a breast implant warranty payment, the loss is not reflected in the manufacturer's balance sheets or filings with the Securities and Exchange Commission.  In addition, because the captive is not a third-party company, manufacturers with captive insurance companies are free to manipulate the claims process without outside interference.

44.     In similar and related lawsuits filed against Allergan in state court, Clayman Senior, Clayman Junior, and Elana Clayman (the spouse and mother of Senior and Junior, respectively) were deposed on December 4, 2018.  In each of their depositions, when asked about his or her involvement in a fraudulent breast implant warranty scheme with Allergan, the three Claymans invoked their Fifth Amendment rights against criminal self-incrimination.

45.     On July 8, 2020, in depositions for another related and similar lawsuit filed in state court, two current and one former Clayman Practice employee invoked their Fifth Amendment rights against criminal self-incrimination in response to questions about whether Allergan and

---

[5]     *See*  https://opencorporates.com/companies/us_hi/206243D1  (last visited December 4, 2020).

Mojica were parties to an agreement or understanding with the Claymans to make false breast implant warranty claims.

46.    In an August 12, 2020 deposition for another similar related case in state court, Clayman Senior refused to answer questions about Mojica and Allergan warranty claims, and he again invoked his Fifth Amendment rights against criminal self-incrimination.

**Allergan's Similar Course of Conduct Across Other Divisions**

47.    The breast implant warranty scheme is not the first instance in which Allergan has been implicated in a physician bribery scheme, as Allergan has been implicated in violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), <u>at least six times, resulting in Allergan paying a total of $1.089 billion</u> in criminal penalties and civil settlements.

The federal Anti-Kickback Statute prohibits anyone from

knowingly and willfully offer[ing] or pay[ing] remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

…

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program[6]…

42 U.S.C. §1320a-7b(b)(2).

48.    Over the past ten years, Allergan was involved in the following:

---

[6]    Because the Clayman Practice's patients paid for their breast augmentation procedures with cash (not under a Federal health care program), the Anti-Kickback Statute does not apply to the Clayman scheme, and Plaintiffs assert no claim under the Anti-Kickback Statute. Plaintiffs, however, allege the facts concerning Allergan's conduct in violation of the Anti-Kickback Statute to show this Court that it is plausible that Allergan, consistent with its past criminal conduct, engaged here in criminal conduct by conspiring with, and substantially assisting, the Clayman Practice to perpetrate fraud upon its patients.

A.      **September 1, 2010**, Allergan was forced to pay $600 million in settlement of criminal and civil complaints that included allegations of providing free physician workshops and dinners, paying physicians to attend "advisory boards" promoting off-label uses, and created Alphamedica, which administered a speakers bureau that paid physicians $1,000 to allow sales representatives to shadow them at work.[7]

B.      **September 15, 2010**, Allergan's Forest Laboratories division was forced to pay a $313 million settlement of criminal and civil complaints that included allegations of cash payments to physicians that the company described as "grants" and "consulting fees," expensive meals, and lavish entertainment to physicians to induce them to prescribe the drugs Celexa and Lexapro.[8]

C.      **October 29, 2015**, Allergan's Warner Chilcott division was forced to pay a $125 million settlement in a case that included allegations of violations of paying doctors speaker fees to induce them to prescribe the drugs Asacol, Actonel, and Loestrin.[9]

D.      **December 15, 2016**, Allergan's Forest Laboratories division was forced to pay a $38 million settlement in a case that included allegations of paying kickbacks to physicians to induce them to prescribe the drugs Bystolic, Savella, and Namenda.[10]

---

[7]      *See*,    https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox;    https://www.cbsnews.com/news/how-allergan-sponsored-a-history-of-sausages-to-promote-botox-illegally/ (last visited December 4, 2020).

[8]      *See*,    https://www.justice.gov/opa/pr/drug-maker-forest-pleads-guilty-pay-more-313-million-resolve-criminal-charges-and-false (last visited December 4, 2020).

[9]      *See*, https://www.wsj.com/articles/allergan-unit-to-plead-guilty-to-fraud-pay-125-million-1446139657/?mod=mktw(last visited December 4, 2020).

[10]      *See*,    https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations (last visited December 4, 2020).

E.      **June 29, 2017**, Allergan was forced to pay a $13 million settlement in a case involving allegations of providing valuable business consulting services, continuing medical education, and other valuable services to physicians to induce them to prescribe Allergan eye care products including Restasis, when other less expensive treatment alternatives were available.[11]

49.      Allergan's previous conduct demonstrates that its involvement in the breast implant warranty scheme was and is part of a larger course of conduct whereby the company's marketing plan includes bribing physicians to increase sales.

### Elyssee N. Faulk

50.      Ms. Faulk first presented to the Clayman Practice for a breast augmentation consultation with Clayman Senior on January 6, 2004.  After a brief physical examination, Clayman Senior offered to perform an "Augmentation Mammoplasty" for the total cost of $3,500.  Ms. Faulk paid $3,500 in full on or before the date of surgery.

51.      On March 14, 2005, Ms. Faulk presented to the Clayman Practice for her first breast surgery with Clayman Senior.  In a form titled "Risks of Operations of the Breast," Ms. Faulk documented that she wore a 32 A bra, and that she wanted to be a "full C – baby D."  She also wrote that she wanted to know the "number of CC's" Clayman Senior would be using to inflate her implants, and whether her breasts would be "even if [she had] scoliosis."

52.      In the Operative Report and OR Record, both of which were dated March 14, 2005, Clayman Senior documented that he implanted "350cc McGhan saline implants" bilaterally, although he failed to document the amount of saline he used to inflate the implants.

---

[11]     *See*     http://www.pietragallo.com/library/files/nevyas_allergan_press_release_final.pdf. (last visited December 4, 2020).

53.     On July 28, 2005, Ms. Faulk returned to the Clayman Practice with complaints that she had ripples in her implants, that one of her implants was "a lot smaller," and that her breasts were "always hard."  The only action that Clayman Senior documented taking was prescribing the topical acne cream Renova to her.

54.     On August 1, 2006, Ms. Faulk returned to the Clayman Practice with complaints that she still had "rippling" at her implant, and that it seemed like one of her implants was "getting empty."  After a brief physical examination, Clayman Senior recommended a bilateral increase."

55.     On November 22, 2006, Ms. Faulk presented to the Clayman Practice for her second breast surgery with Clayman Senior.  In the Operative Report dated November 22, 2006, Clayman Senior documented adding saline to both implants, although he failed to document the amounts of saline he used.

56.     On March 3, 2010, Ms. Faulk returned to the Clayman Practice with complaints that her breasts were not even.  After a brief physical examination, Clayman Senior told Ms. Faulk that she had a deflation at her right breast implant, that she needed surgery to remove and replace the implant, and that there would be no cost to her for the surgery because it would be covered by Allergan's warranty.

57.     On March 3, 2010, Clayman Senior and/or Clayman Practice staff gave Ms. Faulk a written surgical estimate that stated she had a "Right deflation," and that "co. will supply."

58.     On April 2, 2010, Ms. Faulk presented to the Clayman Practice for her third breast surgery with Clayman Senior.  In the surgical intake form she wrote that she wanted her breasts to be "softer," "a tad closer if possible," "bigger/fill in loose skin"; she also wrote that she wanted her "Left Nipple [to be] even with Right Nipple."   Upon her arrival, Clayman Senior and/or Clayman Practice staff had Ms. Faulk sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "Right deflation" and that she would be having a

"Left adjustment."  A preoperative photograph taken that day of her breasts by Clayman Senior and/or Clayman Practice staff demonstrates that she did not have a rupture, deflation, or leak at either of her breast implants.

59.     In the Operative Report and OR Record, both of which were dated April 2, 2010, Clayman Senior documented her preoperative diagnosis as "Possible deflation of right implant." In the Operative Report, he further documented that upon dissecting down to the implant capsule on the right, the "implant was found to have a partial deflation and removed."  Upon dissecting down to the implant capsule on the left, the "implant was found to have a partial deflation and removed."  Both implants were replaced with Allergan Natrelle Style 68 High Profile 400cc saline implants.  Clayman Senior documented grossly overfilling both implants with 600 cc's of saline.

60.     On or about April 2, 2010, Clayman Senior and/or Clayman Practice staff had Ms. Faulk sign an Allergan breast implant warranty claim form that stated she had a rupture, deflation, or leak at her right and left implants, and that as a result she had to undergo surgery to remove and replace both implants.  The Clayman Practice then sent the removed implants and completed warranty claim form to Allergan's Product Support Department, from which they were forwarded to the Device Analysis Laboratory.  After conducting an analysis of the implants, the Device Analysis Laboratory found no basis for the claimed *spontaneous* ruptures, deflations, or leaks. Nevertheless, on May 6, 2010, the Clayman Practice received a $1,200 warranty check from Allergan for the returned implants.

61.     On February 18, 2015, Ms. Faulk returned to the Clayman Practice with complaints that one of her breasts was larger than the other and "lopsided."  After a brief physical examination Clayman Senior told Ms. Faulk that she had "deflation" of her right implant, that she needed to have surgery to remove and replace both implants, that she needed to undergo a  "crescentpexy

lift," and that there would be no cost to her for the surgery (other than $200 for new warranty) because the surgery would be covered by Allergan's warranty.

62.     On February 18, 2015, Clayman Senior and/or Clayman Practice staff gave Ms. Faulk a written surgical estimate that stated she had a "Right deflation," that she needed "Bilateral replacement" and "Crescentpexy-lift," and that there would be no charge because "Co. will supply."

63.     On February 23, 2015, Ms. Faulk presented to the Clayman Practice for her fourth breast surgery with Clayman Senior.  In the surgical intake form she wrote that her "Right Breast [was] smaller than the Left & Left Nipple is Lower than Right Nipple."  Upon her arrival, Clayman Senior and/or Clayman Practice staff had Ms. Faulk sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "Right deflation" and needed "Bilateral Replace Saline crescentpexy."   A preoperative photograph taken that day of her breasts by Clayman Senior and/or Clayman Practice staff demonstrates that she did not have a rupture, deflation, or leak at either of her breast implants.

64.     In the Operative Report and OR Record, both of which were dated February 23, 2015, Clayman Senior documented Ms. Faulk's preoperative diagnosis as "Right deflation."  In the Operative Report, Clayman Senior further documented that upon dissecting down to the implant capsule on the right, the "right implant was found to have approximately 50% deflation with (tissue/leak @ valve) and removed."  The left implant was found to be intact, but it was also removed.  Both implants were replaced with Allergan Natrelle Style 68 High Profile 400cc saline implants.  Clayman Senior failed to document the amount of saline he used to inflate the implants.

65.     On or about February 23, 2015, Clayman Senior and/or Clayman Practice staff had Ms. Faulk sign an Allergan breast implant warranty claim form that stated she had a rupture, deflation, or leak at her right implant, and that as a result she had to undergo surgery to remove

and replace both implants.  The Clayman Practice then sent the removed implant and completed warranty claim form to Allergan's Product Support Department, from which they were forwarded to the Device Analysis Laboratory.  After conducting an analysis of the implant, the Device Analysis Laboratory found no basis for the claimed *spontaneous* rupture, deflation, or leak. Nevertheless, on April 14, 2015, the Clayman Practice received a $2,400 warranty check from Allergan for the returned implants.

66.    Ms. Faulk was last seen by Clayman Senior when she returned to the Clayman Practice to have her sutures removed from the February 23, 2015 surgery.

67.    On August 15, 2017, Ms. Faulk presented to a different plastic surgeon for a consultation.  At the time she reported that she was unhappy with the size and discomfort of her breasts.  Upon examination, the other plastic surgeon noted that her breasts were "approximately double D to triple D size for her frame," that the breast skin was "thinned out," and that she had "minimal breast tissue."  The other plastic surgeon recommended removal of the implants from Clayman Senior, replacement with smaller silicone filled breast implants, and bilateral mastopexy.

## COUNT I – ALLERGAN AND MOJICA AIDING AND ABETTING

## THE CLAYMANS' BREACH OF FIDUCIARY DUTY AND/OR FRAUD

68.    Ms. Faulk re-alleges and incorporates by reference paragraphs 1 through 67.

69.    Throughout the care and treatment of Ms. Faulk, the Claymans breached their fiduciary duty owed to her by:

(a).    On one or more occasions, claiming that one of her breast implants had spontaneously ruptured, deflated, or leaked when it had not.

(b).    Performing revision surgeries on April 2, 2010; and February 23, 2015, based upon alleged spontaneous implant ruptures, deflations, or leaks that did not exist,

which placed her at increased risk for surgical and anesthetic complications, and which involved simply repeating the same procedure that was previously performed.

(c).    Not performing the surgery that her physical condition actually required, in favor of surgery that took less time and skill, to allow for the removal and replacement of saline implants under Allergan's Warranty.

70.    On one or more of the below occasions, the Claymans made the following false statements or representations, which were intended to conceal their financial and other personal motivations in connection with the removal and replacement of allegedly ruptured, deflated, or leaking Allergan Natrelle saline implants, and which in fact misled Ms. Faulk and/or others, and/or caused her to respond in the following ways to her detriment:

(a).    On March 3, 2010, at the Clayman Practice, Clayman Senior told Ms. Faulk that she had a deflation at her right breast implant, that she needed surgery to remove and replace the implant, and that there would be no cost for the surgery because it would be covered by Allergan's warranty.  In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or the ability to correct the problems at her breasts.  These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of a defective saline implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(b).    On March 3, 2010, Clayman Senior and/or Clayman Practice staff gave Ms. Faulk a written surgical estimate that stated she had a "Right deflation" and "co. will

supply." In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or the ability to correct the problems at her breasts. These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of a defective saline implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(c).    On April 2, 2010, Clayman Senior and/or Clayman Practice staff had Ms. Faulk sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "Right deflation" and that she would be having a "Left adjustment." In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or the ability to correct the problems at her breasts. These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of a defective saline implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(d).    In the Operative Report and OR Record, both of which were dated April 2, 2010, Clayman Senior documented Ms. Faulk's preoperative diagnosis as "Possible deflation of right implant." In the Operative Report he further documented that upon dissecting down to the implant capsule on the right, the "implant was found to have a partial

deflation and removed." Upon dissecting down to the implant capsule on the left, the "implant was found to have a partial deflation and removed." In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or the ability to correct the problems at her breasts. These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of defective saline implants rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(e).    On or about April 2, 2010, the Claymans made a warranty claim to Allergan regarding the right and left breast implants removed from Ms. Faulk on April 2, 2010. Specifically, the Claymans had Ms. Faulk sign a warranty claim form that stated she had a spontaneous rupture, deflation, or leak at both of her breast implants, for which she needed both implants removed and replaced. By having Ms. Faulk sign this claim form the Claymans represented to her and others that her breast implants had spontaneously ruptured, deflated, or leaked and needed to be replaced. In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of defective breast implants rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a

result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(f).    On February 18, 2015, at the Clayman Practice, Clayman Senior told Ms. Faulk that she had a "deflation" of her right implant, that she needed surgery to remove and replace both implants, that she needed to undergo a "crescentpexy-lift," and that there would be no cost to her for the surgery (other than $200 for a new warranty) because it would be covered by Allergan's warranty.  In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(g).    On February 18, 2015, Clayman Senior and/or Clayman Practice staff gave Ms. Faulk a written surgical estimate that stated she had a "Right deflation," that she needed "Bilateral replacement" and "Crescentpexy-lift," and that there would be no charge because "Co. will supply.  In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior

instead of from a different plastic surgeon.  As a result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(h).    On February 23, 2015, Clayman Senior and/or Clayman Practice staff had Ms. Faulk sign an "Authorization for and Consent to Surgery or Therapeutic Procedures'' that stated she had a "Right deflation" and needed "Bilateral Replace Saline crescentpexy." In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(i).    In the Operative Report and OR Record, both of which were dated February 23, 2015, Clayman Senior documented that Ms. Faulk's preoperative diagnosis was "Right deflation."  In the Operative Report he further documented that upon dissecting down to the implant capsule on the right, the "right implant was found to have approximately 50% deflation with (tissue/leak @ valve) and removed."  In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant, rather than the medical negligence of Clayman Senior; these representations also caused her to agree to

26

have another surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(j).    On or about February 23, 2015, the Claymans made a warranty claim to Allergan regarding the right breast implant removed from Ms. Faulk on February 23, 2015 by Clayman Senior.  Specifically, the Claymans had Ms. Faulk sign a warranty claim form that stated she had a spontaneous rupture, deflation, or leak at her right breast, for which she needed both implants removed and replaced.  By having Ms. Faulk sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced.  In fact, Ms. Faulk did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Faulk and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Faulk did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

71.    For the reasons previously stated in paragraphs 30 through 40 above, Allergan and Mojica knew that the Claymans were breaching a fiduciary duty owed to Ms. Faulk, and/or committing fraud upon her.  Despite this knowledge, Allergan and/or Mojica provided substantial assistance to the Claymans in committing fraud against Ms. Faulk, and/or breaching a fiduciary duty owed to her, in one or more of the following ways:

(a).    Continuing to sell saline breast implants to the Claymans while Ms. Faulk was a patient of the Claymans; and

(b).    Ensuring and/or making payment of the warranty claims of the Claymans in relation to the saline implants that Clayman Senior surgically removed from Ms. Faulk on April 2, 2010; and February 23, 2015.

72.    As a direct and proximate result of the substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Faulk suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

73.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Faulk has spent monies in the amount of $3,500 or more, for medical and/or surgical care by the Claymans that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **ELYSSEE N. FAULK**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT II – ALLERGAN, MOJICA, AND THE CLAYMANS' CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY AND/OR FRAUD

74.    Ms. Faulk re-alleges and incorporates by reference paragraphs 1 through 67, 69, and 70.

75.     On or before March 3, 2010, Allergan, Mojica, and the Claymans entered into an agreement to commit one or more breaches of a fiduciary duty and/or fraud in relation to the Claymans' patients.  The acts and conduct illustrative of the parties' intent to enter into this agreement are alleged in paragraphs 27 through 46 above.  Furthermore, Mojica had a personal stake in the activities of the conspiracy that was separate from Allergan's interests in the conspiracy, i.e. his personal advancement within the company and individual incentive pay and/or commissions.

76.     Allergan and/or Mojica committed one or more of the following overt acts in furtherance of the conspiracy to breach a fiduciary duty and/or to commit fraud:

(a).     Continuing to sell saline breast implants to the Claymans while Ms. Faulk was a patient of the Claymans; and

(b).      Ensuring and/or making payment of the warranty claim of the Claymans in relation to the saline implants that Clayman Senior surgically removed from Ms. Faulk on April 2, 2010; and February 23, 2015.

77.     As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty, Ms. Faulk suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

78.     Furthermore, as a direct and proximate result of the above noted conspiracy to breach a fiduciary duty and/or to commit fraud, Ms. Faulk has spent monies in the amount of $3,500 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice

that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **ELYSSEE N. FAULK**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – FLORIDA CIVIL RICO AND REMEDIES
## FOR CRIMINAL ACTIVITIES – CONSPIRACY

79.    Ms. Faulk re-alleges and incorporates by reference paragraphs 1 through 67, 69, 70, 75, and 76.

80.    Allergan and Mojica violated sections 772.103(4) and 895.04(4), *Florida Statutes*, by conspiring with the Claymans to violate sections 772.103(3) and 895.03(3), respectively.

81.    In connection with the conspiracy, Allergan, Mojica, and the Claymans agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity. Specifically, (1) Allergan's employees or agents, including its breast implant sales representatives working under Mojica, (2) Mojica, and (3) the Claymans agreed that if the Claymans would continue to purchase greater numbers of breast implants and/or other aesthetic products, that Allergan and Mojica would ensure that all of the Claymans' saline breast implant warranty claims would be paid, even though Allergan and Mojica knew that all of the Claymans' saline breast implant warranty claims were false.  By this agreement, (1) Allergan would increase its overall volume of sales for breast implants or other aesthetic products in Florida, (2) Mojica would receive greater commissions or incentive pay, as well as greater individual advancement within Allergan, and the Claymans could mollify breast implant patients whose bad outcomes would otherwise

cause them to seek out different plastic surgeons and/or file medical malpractice lawsuits against the Claymans.

82.     Allergan, Mojica, and the Claymans agreed to the overall objective of the conspiracy, or they agreed to commit personally at least two acts of criminal and racketeering activity.

83.     The agreement to engage in unlawful acts between Allergan, Mojica, and the Claymans was reached on an unknown date after Allergan acquired McGhan/Inamed, and after Mojica became Allergan's Southeast Regional Sales Director for breast implant sales.

84.     The predicate acts in furtherance of the conspiracy by Allergan, Mojica, and the Claymans began on an unknown date after Allergan acquired McGhan/Inamed, and after Mojica became Allergan's Southeast Regional Sales Director for breast implant sales.

85.     The predicate acts of Allergan, Mojica, and/or the Claymans in furtherance of the conspiracy continued to occur until at least October 26, 2017.

86.     Pursuant to the conspiracy, the Claymans progressively increased their purchases of Allergan breast implants and other aesthetic products in each year that Mojica was Allergan's Southeast Regional Sales Director.

87.     By way of illustration, Allergan and Mojica performed the following predicate acts in furtherance of the conspiracy:

(a).     Ensuring or making payment of the Claymans' saline breast implant warranty claim in relation to patient Amber Thigpen on May 28, 2010, even though Allergan and Mojica knew said warranty claim was false;

(b).     Ensuring or making payment of the Claymans' saline breast implant warranty claim in relation to patient Amber Thigpen on July 29, 2011, even though Allergan and Mojica knew said warranty claim was false; and

(c).    Ensuring or making payment of the Claymans' saline breast implant warranty claim in relation to patient Amber Thigpen on October 18, 2012, even though Allergan and Mojica knew said warranty claim was false.

88.    As a direct and proximate result of acts taken in furtherance of the conspiracy, Ms. Faulk suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

89.    Furthermore, as a direct and proximate result of acts taken in furtherance of the conspiracy, Ms. Faulk has spent monies in the amount of $3,500 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

90.    Despite her diligence and efforts, Ms. Faulk's discovery of these ongoing injuries was delayed by Allergan, Mojica, and/or the Claymans' fraudulent concealment activity.

91.    As a result of the foregoing, Ms. Faulk has had to hire the undersigned attorney and his law firm, and has agreed to pay him/them a reasonable fee for his/their services.

92.    Pursuant to Section 772.104, *Florida Statutes*, Ms. Faulk is entitled to recover treble damages plus costs and attorney's fees from Allergan and Mojica.

WHEREFORE, the Plaintiff, **ELYSSEE N. FAULK**, pursuant to Section 895.05, *Florida Statutes*, demands judgment for treble actual and consequential damages arising from the conduct of the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, an award of costs and all reasonable attorneys' fees, and the following additional remedies:

A.    A preliminary injunction prohibiting similar conduct by the Defendants in the State of Florida;

B.    A permanent injunction prohibiting similar conduct by the Defendants in the State of Florida;

C.    Revocation of the certificate authorizing the Defendant, **ALLERGAN SALES, LLC**, to do business in the State of Florida;

D.    Forfeiture of all monies and real and personal property received or obtained by the Defendants as a result of the acts alleged in this Count, and the Plaintiff, **ELYSSEE N. FAULK**, will have a claim for any and all such forfeited monies and real and personal property;

E.    A civil penalty against the Defendant, **RICARDO E. MOJICA**, in the amount of $100,000;

F.    A civil penalty against the Defendant, **ALLERGAN SALES, LLC,** in the amount of $1,000,000; and

G.    Any further relief the Court deems just and proper.

Dated this 23rd day of August, 2021.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:    (904) 632-2424
Facsimile:    (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: jfleury@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 23, 2021, a true and correct copy of the foregoing

has been filed through the Court's CM/ECF case management system, which will serve a notice

of electronic filing to all counsel of record below.  A copy of the foregoing will also be furnished

to a process server for service of process on defendant Ricardo Mojica.

**Brian T. Guthrie**
Bguthrie@shb.com
**Jennifer M. Voss**
jvoss@shb.com
SHOOK HARDY & BACON, L.L.P.
100 North Tampa Street, Suite 2900
Tampa, Florida 33602
Telephone: (813) 202-7100
Facsimile: (813) 221-8837
*Counsel for Allergen Sales*

/s/*Christopher Shakib*
Attorney